We'll hear argument first this morning in Case 08-1423, Costco Wholesale Corp. v. Omega. Mr. Englert. Mr. Chief Justice, and may it please the Court. This case is a repeat of Quality King v. Lanza, with only one pertinent difference. Both cases involve goods not authorized for importation into the United States. Both cases involve arguments that the first sale doctrine must be narrowly construed to, lest the Copyright Act's importation ban, Section 602a, be given less than its supposedly intended scope. The only difference is place of manufacturer's goods. Quality King involved U.S.-manufactured goods. This case involves goods made in Switzerland. According to the Ninth Circuit in Omega, Congress intended to treat foreign-manufactured goods better in this respect than goods made in the United States. It is wildly implausible that Congress had any such intent. From 1790 to 1891, foreigners were categorically ineligible to hold U.S. copyrights. From 1891 to 1986, the United States discriminated against foreign manufacturing of copyrighted goods through a series of so-called manufacturing clauses, including Section 601 of the 1976 Act. If Congress intended to make the first sale doctrine discriminate in favor of foreign manufacturing at the same time, one would expect some note to be taken of that fact in the legislative history, but none is. And yet the Ninth Circuit held that Congress in 1976 altered the long-established first sale doctrine to make it uniquely favorable to foreign manufacturing of copyrighted goods, and did so through the obscure phrase, lawfully made under this title, in Section 109. No one in all the briefs in this case has identified a single reason why Congress would have wanted to do so. Moreover, the words lawfully made under this title are used elsewhere in the Copyright Act, and they never mean what the Ninth Circuit said they mean in Section 109. Most instructive is the very next section after Section 109, Section 110, which governs educational use of copyrighted works and was enacted contemporaneously with 109. In describing the kinds of works teachers may show students in their classroom without fear of copyright liability, Congress referred to works lawfully made under this title. Our briefs have pointed out the absurdity of construing the phrase in Section 110 to mean made in the United States, and it's very revealing how Respondent and Nitsamiki have tried to answer that point. Omega says lawfully made under this title means either made in the United States or authorized for distribution in the United States. If that argument gives up any pretense. Sotomayor, would you clarify for me what your exact meaning is? Your blue brief and your reply brief appear to give two different meanings. I hope not, Your Honor. I believe our system is clear. Your reply brief suggests that if Omega grants foreign reproduction and distribution rights, but retains U.S. rights, that the First Sale Doctrine would allow Omega to bar importation. If it grants exclusive foreign distribution. Why does it matter? Because your blue brief says that lawfully made means anything that was made with Omega's consent or authority. So what why the difference at all? It matters, Your Honor, because of the underlying rationale of the First Sale Doctrine and the underlying rationale of the import ban in Section 602. The purpose of the First Sale Doctrine is to make sure that the copyright owner gets one and only one recompense for each copy, for each lawfully made copy. Sotomayor, if he sells his rights to a foreign manufacturing distributor, he gets paid for those rights, why should he now have any additional rights to bar that authorized copy from being imported into the United States? Yes, Your Honor. I don't understand what. The reason is to give effect to the examples given in the legislative history of Section 602. Sotomayor, do you mean to the examples in the legislative history or in the examples in Quality King? Oh, the Quality King has a paragraph, much discussed in the briefs, which cites to the legislative history of Section 602 and in particular cites to witness statements that are in the committee prints that are part of the legislative history of Section 602. So do you think that there's a difference between assigning a copyright to a foreign entity or merely licensing a foreign entity? One of the criticisms of your approach is that you would draw a line between those two. We don't draw a line between those two, Your Honor. The line depends on whether the copyright owner has given exclusive foreign rights to someone else. And the reason the exclusivity of the foreign rights matters is because that is the paragraph in Quality King. And to give meaning to Section 602 and to be completely consistent with the rationale of the First Sale Doctrine, one must draw some line. Drawing the line between U.S. manufacturer and foreign manufacturer makes no sense. It's not consistent with the purposes of anything. Drawing a line between an exclusive grant of rights, whether by license or assignment, to a foreign manufacturer or foreign distributor, rather, and not granting such exclusive rights, is perfectly consistent with the rationale of the First Sale Doctrine. Breyer, talking about the First Sale Doctrine, the perfectly consistent rationale would be whether there's a first sale. So 109, though it doesn't say it, but if you look at the history in the title, there has to be a transfer. So, in fact, if the British publisher, with a British right given by an American author or publisher, makes this, 109 doesn't apply. I mean, 109 doesn't apply until there's a sale. Now, that makes you haven't adopted that. Nobody, I guess maybe one of the Micah's briefs does, but I don't see why that isn't perfectly sensible and I find no authority against it. Well, Your Honor, since that's a broader position than ours and we would win the case if we had rationality. I know it is, but the trouble with your position is it gets everybody, I think, going to be – I mean, I don't know what all these contracts say. There are hundreds of thousands of them, if not millions. And what I don't see is why you don't just say the first sale doctrine has always meant there was a transfer or sale. It meant that in 1792 when I took Phila Reed's antitrust course and he used to bring it up. You go back to the 18th century, it's always meant there has to be a sale or transfer. So why don't we just read 109 that way and there you give meaning to everything and there's just no problem? Now, I raise that not because – I raise it because since there's only a few people really supporting this, there must be some problem with what I say. So what is it? Well, the issue, Your Honor, and you're putting me in the position of arguing against myself a little bit, but the issue is a fair reading of the legislative history of section 602, not the text, but the legislative history, is that Congress did intend to allow certain blocking of imported goods when there had been a big transfer. Breyer. And of course, if you say there has to be a first sale, there's no problem. You block that British manufacturer from sending his books to the United States, but you don't block the person to whom he sells it. It gives meaning to everything. Okay, Your Honor. I mean, no, I'm putting that to you because since you haven't advocated it, I must be missing something and I'm not an expert in copyright law. What am I missing? Well, there is a dictum in this Court's opinion in Quality Game that suggests that if a publisher and a – if an American publisher gives exclusive rights to a British publisher, or if an American author or a British author gives exclusive territorial rights to two different publishers, then 602 retains meaning in that situation. Exactly, and that's what it does under my theory because there's been no first sale. No, but with respect, Your Honor, it's my understanding of both the legislative history and this Court's dictum that they refer to second and subsequent sales. Oh, you mean they're talking about jobbers? Somebody goes and buys, and so then you lose, because if that's what we're supposed to follow, those excerpts in the legislative history, then it would mean that a person who buys from the British publisher cannot import into the United States because 109 doesn't apply. No, that's not what the example means. It doesn't say categorically all second sales from British publishers are not subject to the first sale doctrine. What it says is in a situation in which rights have been divided and exclusive territorial rights have been given in two different countries, or to put it in copyright language, in the language you also used in the legislative history, when the copyright owner has divided its rights, because in innovation of the 76 Acts, the copyright rights became divisible. Scalia, where do you get that in the text? I mean, that's lovely. And you're saying that what Justice Breyer suggests makes perfect sense, except for dictum and legislative history. Well, does your position make any sense with regard to text? Yes, absolutely, Your Honor. Where is that limitation in the text? The other side's effort to read section 602 broadly has no support in the text after  But as it is in the text, it's not in the text. I understand. Your limitation on exclusive rights abroad versus non-exclusive rights abroad, where can you possibly find that in the text? You cannot. Well, that's the end of it for me. Well, let us. I have to say I didn't even see it in the legislative history. I didn't think they made a big deal about jobbers. Let us talk about it. I like history here. Go back to 1792. Sure. Mr. Englund, would you also talk about what, if anything, 602A1 does then? It seems 602A2 is dealing with infringing goods, with pirated goods. So given the first-sale doctrine as you construe it, what does 602A1 protect? 602A1 is limited to imports and doesn't confer a private right of action. 602A2, which was enacted after the Ninth Circuit ruled in this case, adds a private right of action and adds exports. But it is 602A2 is a new statute. It was not part of the 1976 Copyright Act. So it is a subsection in which Congress expanded on what was already prohibited in 602A1. Now, with respect to text, the text that the Court is construing is five words, lawfully made under this title. And those five words are used in several places in the Copyright Act, including section 110 for educational use. The government says lawfully made under this title can mean two different things in section 109 and section 110, provisions of the same chapter of the Copyright Act enacted contemporaneously. As a fallback position, the government says there is nothing wrong with having copyright liability for teachers who show foreign-made films in the classroom as long as they know they weren't made in the United States. So, for example, showing an Ingmar Bergman film, The Seventh Seal, in class would be copyright infringement, according to the government. Even the people who make movies don't agree with that argument. The Motion Picture Association of America has filed an amicus brief in this case. And on page 19 of its brief, the MPAA says that the result the government says is A-OK is, quote, a nonsensical and unintended consequence. The MPAA goes on to say there is no evidence that such liability has ever been imposed, but that argument misses the point. We are trying to ascertain what Congress meant by using the phrase lawfully made under this title, not making a policy argument about consequences.  And I'm not going to go into the details of that, because I don't think it's a good place to mean made in the United States. There's nothing extraterritorial about construing lawfully made in this title as a choice of law clause which means lawfully made according to standards of the U.S. Copyright Act anywhere in the world. In that respect, this case is no different from Quality King, in which the Court rejected an extraterritoriality argument in a two-sentence footnote. Scalia, you don't really mean your position is that lawfully made under this title means that would have been lawfully made under this title if this title governed. Isn't that basically what you're saying? Horwich, Yes. Scalia, okay. But there is another provision of the statute, I forget where it is, which says that in so many words. Horwich, Not quite, Your Honor. In section 602A2 and in section 602B, Congress used the phrase would have constituted an infringement if this title had been applicable, and it says that it's much prettier. Scalia, If this title had been applicable, right. I say applicable, right. Horwich, Okay. Scalia, Much prettier. Horwich, Yes. That is the phrase Congress used to express a certain disfavored class of goods, goods that would have been infringing if this title had been applicable. 110 — 109, excuse me, and 110 are a different purpose. They're the purpose of favoring goods, goods that have been lawfully made under this title. So, yes, Congress could have chosen to use a variation of the phrase if this title had been applicable in 109, but it didn't. And we are left with the language Congress enacted, but it is language that Congress uses at least four different places in the Copyright Act. And we have a pretty good idea that it doesn't mean made in the United States and it doesn't mean what Omega says it means, which is made in the United States or authorized at any time for distribution in the United States. Ginsburg, May I ask you, Mr. Englert, now, I see that 602A is now broken into the 1 and 2, and it's 602B that deals with the pirated goods, but what does 602A shall do? How does it coexist with the first-hand doctrine? Englert, Your Honor, as you know, there is no reference in the legislative history to the interaction between 602A and 109, and therefore, this Court had to address that question for the first time in Quality King, and the Court rejected the argument that 109 is inapplicable to imported goods altogether. The Court did say in a dictum, which has been discussed already this morning, that if a British and an American publisher divide rights, then section 602A does have a role to play. But the Court did not say books manufactured in Britain are not subject to the first sale doctrine. Ginsburg, but there was a concurring opinion that says this case is about a round trip and doesn't talk to goods that are bought. Englert, Your Honor, correct. And the concurring opinion cited two distinguished copyright treatises that suggested there was some concern about extraterritoriality in this case. Well, even the government has conceded there is no concern about extraterritoriality in this case. So the rationale of those treatises, learned though they are, is undermined. If one looks more closely at those treatises, they argue the language is so plain that it can only be construed one way, the government concedes that's not true. They argue extraterritoriality, as I've already said, and they argue that this Court's dictum in Quality King, the later editions of those treatises, argue that this Court's dictum in Quality King drew a distinction based on place of manufacture, but it's only the concurring opinion, not the dictum in the Court's opinion that mentions place of manufacture. So it's a very thin reed to say that the case turned on place of manufacture. And again, one can find nothing in the Quality King dictum, nothing in the legislative history of 602, nothing in the legislative history of 109 that talks about place of manufacture. Scalia, and nothing in the text that supports your position. No. What supports our position, Your Honor, is the text of 109, the use of the phrase lawfully made under this title, and the use of that phrase elsewhere in the Copyright Act. Scalia, you pull out of the sky this distinction between having granted exclusive rights abroad and having granted nonexclusive rights abroad. Where does that come from? That comes from legislative history, Your Honor. And for those who prefer not to look at legislative history, that distinction may not hold up. But if that distinction doesn't hold up, that strengthens my position. Scalia, did the legislative history suggest what part of the text this novel suggestion was based upon? It does not. The relevant legislative history is witness statements. I do read legislative history, but I don't really find anything that it said that they are worried about an American and a British publisher dividing rights, and they want them to do that. There's no problem with that, because there's never been a sale. So they divide the rights. And there isn't even a problem with buyers from the British publisher, because a reasonable vertically imposed territorial agreement or other restriction on resale is lawful. If it's reasonable, they don't even need copyright. If it isn't reasonable, why should they have it? Pardon me, Justice Breyer. It was not lawful at the time of enactment of this statute. This Court had not yet decided GTE is Sylvania, and territorial restrictions were per se unlawful at the time Congress enacted this statute. Here, but in Europe, I guess, they were lawful. I don't know the state of the law in Europe in 1976. I think it's always been true. But again, what the Court has asked me many questions about is whether I'm giving too broad a scope to section 602 and too narrow a scope to section 109. Our position is that section 109 has a necessarily broad reach, and we have tried to accommodate the legislative history and the dictum in quality king to give some role for section 602 to play in the case of non-paradical goods. If the Court wants to reject anything, if it wants to reconsider the dictum in quality king or not rely on legislative history, that makes my position much longer.  Breyer, my question really wasn't to argue with you. My question was, where in the legislative history does it say that the point of 602 is to prevent a foreign publisher from selling copies to a distributor, and then that distributor resells them to the United States? I'm not saying it doesn't. It's just that I didn't focus on those particular words directly. And, Justice Breyer, to be fair about what the legislative history says, it is statements by witnesses. It is not statements by committees. So it's a little bit hard to tell where they're drawing the line. Breyer, in other words, somebody wanted that. I understand the industry wanted it. But is there anything in there that suggests that this is what Congress wanted to do, members of Congress? Even I draw the line somewhere. Yes. Yes. Let me write that down. Justice Breyer, we do know that section 602A has some role to play. And when this Court was trying to figure out in quality king what role it had to play, it did look to the statements of Mrs. Harriet Pilpel, Mr. Horace Mangese and the American Book Publishers Council, and those are the statements that the Court said in dicta presumably reflected congressional intent. And so I am relying on those statements for the limitation of section 109 to accommodate section 602. But, again, if the Court disagrees with me and wants to give less of a role to 602 and more of a role to section 109, that is, of course, further resistance to my position. I'd like to reserve the balance of my time for rebuttal. Thank you, Mr. Englert. Mr. Panner. Mr. Chief Justice, and may it please the Court. Section 602A1 allows the distribution of foreign-made copies abroad without the U.S. copyright holder forfeiting the exclusive right to distribute copies domestically, which is guaranteed by section 106.3, and that provision applies in this case. And unlike in Quality King, section 109A provides Costco with no defense, because the copies at issue were not lawfully made under this title. That is, the making of the copies was not subject to or governed by U.S. copyright law. The decision of the court of appeal should thus be affirmed for three basic reasons, and the first depends on the plain language of section 109A, which applies only to copies that were lawfully made under this title. And what do you say made means? Well, made certainly includes the creation of the physical copy, and it also includes the addition of any necessary intellectual property rights that would permit distribution in the United States. So that is to say that we understand section 109A should be read to reach a situation in which a copy has been subject to an authorized sale in the United States. See, I'm with you. I think the text supports you up to the point where you add the qualification. But once you've added that qualification, I think you're outside the text, just as Costco is outside the text with the qualification that they add. I don't think so, Your Honor, and let me try to explain why. Section 202 of the Act draws a distinction between the material object and the intellectual property rights that are involved in a copyright, and it makes sense. The word made is not, does not correspond to the word reproduce in section 106.1. It's a broader term that can refer also to the addition of these necessary intellectual property rights. And the, what is, I think, important is that the decision whether the copy was lawfully made under this title will, of course, be made at the time of the sale. It is not, the decision doesn't need to be made at the time of manufacture, because the question is how should section 109A or another provision apply to that particular copy. And therefore, there is no need to make a decision at the time of manufacture. Kennedy, the brief for the National Library Association indicates, at the bottom of the American Library Association, indicates at the bottom of page 38 that made might mean cause to exist, cause to appear, and so that it applies the first time that U.S. copyright law lawfully could apply, so that if you lawfully imported into the United States, it would then apply at that time. Well, I think that that probably gets us to pretty much the same place, Justice Kennedy.  And that also gives effect to the language of 602A1, because section 602A1 is actually written in very broad terms. It's written to apply to copies that have been acquired outside of the United States. I think that is, I think, an answer, Justice Breyer, to your objection that any sort of sale ought to suffice. Section 602A1 is designed to permit a U.S. copyright owner to exclude legitimate copies. And if you ask where Congress said that, it's right in the House Committee report, in the legislation. Breyer, and it can. It can exclude legitimate copies before there is a first sale. And the question is, I mean, the text seems to say 602 expands or falls within 106, all right? So that's what it says. It says it's an infringement of the exclusive right to distribute copies. That's the 106 right. And then 109 is an exception from 106. So it's automatically an exception from 602. Now, that's the text. And therefore, you're back at what the meaning of 109 is, for I understand your argument. And it seems to me that's the choice. If you're going to take 109 literally, then everything that comes into the United States can't, without the permission of the copyright holder, but for the exceptions in A3, and a library that brings them in under A3, cannot even lend out the books. That's one choice. And the other choice is to say that lawfully made means it's made without contravening any provision of the Act, if the Act were applicable. What's a third choice, if you want a third choice? Well, a small qualification, Your Honor. The exception in section 602A3 does allow libraries to lend copies that are imported pursuant to that exception. It's for archival or lending purposes. But in any event, I think that that's — I don't want to get caught up on the small point. The more significant point is that section 602A1 is designed to permit a U.S. copyright owner. As Costco admits, it's designed to permit a U.S. copyright owner to exclude legitimate copies that are made overseas. If the only issue were one of contract, there would be no need for section 602A1, because there would be no need to create a copyright remedy where contractual remedies are sufficient. That is in circumstances where there's privity between the U.S. copyright owner or the U.S. copyright owner's direct party and the foreign copyright. Breyer. That's why I started with the first sale doctrine, because if you apply the first sale doctrine as it traditionally has been applied, and if you believe that 109 incorporates that, there's loads of room for 602A1 to act. That's all the instances where the British publisher publishes — makes the book. What they do is they have a license and they try to send it to the United States, and they can't without permission because of 602A1, and then 109 doesn't come into play because there's been no first sale. That's the part of this case that I'm finding the hardest, because literally 109A, as you correctly point out, 109 doesn't say that literally. Well, Your Honor, section 602A1 refers specifically to copies that have been acquired outside the United States, so it does not make sense to say that it's limited to the publisher, because the publisher hasn't acquired the copies. It's produced them. So I think that the difficulty with Costco's reading, by contrast, and I think that some of the Court's questions brought that out this morning, is that either they — that Costco's reading tends to eliminate any practical effect for section 602A1 by making it not apply to legitimate copies, or it makes substantive rights turn on formalities of title, which is quite inconsistent with the structure of the Copyright Act, which actually goes out of its way to make clear that the nature of the rights that are held by the copyright owner, which is defined to mean the owner of any of the many rights that comprise the copyright, are the same regardless of whether there's been a transfer. And so when Costco says, for example, that Omega would have the right to exclude foreign-made copies that were produced by a transferee but cannot do so if it manufactures the copy abroad itself, it really draws a distinction that has absolutely no basis in the text of the Copyright Act and that would make substantive rights, the value of the rights under 602A1 and 106.3, turn on formalities and, again, transfers that really should make no difference in terms of the substantive rights that are available to the copyright owner. Scalia, it seems to me, why didn't they say instead of lawfully made under this title, why didn't they just say made in the United States? Well, Your Honor, I mean, that's what you say it means. Lawfully made under this title, you say means made in the United States. That is not our position, Your Honor. Our position is that lawfully made under this title would include a copy that was manufactured in the United States, but that it is not so limited. And that, if you look at section 1E of our brief, we discuss the fact that an interpretation of lawfully made under this title to include a copy that includes the necessary licenses for distribution in the United States is a consistent reading, is consistent with the language of that provision and gives and is consistent with the traditional understanding that section 109A is intended to reflect an exhaustion principle. So where a U.S. copyright owner has exhausted rights with respect to a particular copy by having been compensated for a right that has been invested into that copy, that can be included in the making.  Scalia, I mean, like the other side, in order to make your theory of the text appear reasonable, you have to bring in a skyhook with a limitation that finds no basis in the text. I don't think so, Your Honor. Again, there is, because the textual evidence is that there is a distinction between reproduction, which is the narrow term used in section 106.1, and the broader term that is used in section 109A, which is made. And again, that inquiry is always going to occur at the time of the challenge sale in the United States. And so the question is, as to that copy. Sotomayor, you are trying to rewrite Quality King. Now you are saying that the entire premise of Quality King is wrong. Not at all, Your Honor, because in Quality King, what the Court held was that a copy that is made in the United States is lawfully made under this title. Sotomayor, where in Quality King do you see anything in Quality King turning on where the goods were made? Well, Your Honor, the reason that there was a decision that barely mentions that at all. Its whole premise was on what the owner did. Did the owner sell this copy? I don't think so, Your Honor. What the — there was no challenge in Quality King to the idea that the copy was made in the United States where the Copyright Act governs. This Court said in our Dastani case that the natural reading of under this title is subject to or governed by this title, and therefore, it is perfectly straightforward reading of the text. But you don't say that. I mean, you bring in this other qualification. But, Your Honor, again, the distinction is between the question whether what the conduct that is being addressed is simply the manufacturer. That's the case here. There's — all that happened here is that the copies were manufactured in Switzerland and sold in Switzerland for distribution abroad. That does not implicate U.S. copyright law at all. U.S. copyright law provides the copyright owner with certain rights to exclude. It has no right to exclude the making of a copy, whatever you want to say the making means, in Switzerland. And it is for that reason that the Ninth Circuit correctly determined that the copies at issue here were not lawfully made under this title. Scalia. How often does the situation change? Scalia. But it would be lawfully made under this title, even though it was made, you know, made abroad, if what? If it were made, for example, pursuant to a license that allowed for distribution in the United States. There would be an affirmative exercise of the exclusive right that the copyright holder has under Section 106.3 with respect to that particular copy. And so it makes perfect sense to say that that copy is lawfully made under this title, because you need to look to U.S. law to determine whether the making of that copy, even though it took place overseas, for example, was governed by — was lawful as determined by the rights that are granted. Scalia. But it isn't the making that is rendered lawful. It's the importation into the United States that's rendered lawful by the agreement that you're relying upon. Well, Your Honor, the making — the question is whether it was lawfully made under this title. If it was made for distribution in the United States, it could only be lawfully made for distribution in the United States if the appropriate rights were granted by the owner of those rights. And that is why it makes perfect sense to say, now, if you're saying it's — you're saying whether or not it's lawfully made depends on something that happens after it's made? In a particular case, it might be, Your Honor, but in the typical case, let's say the Heartland case, if a manufacturer has a license under U.S. copyright to distribute in the United States, it could be lawfully made at that time. But I think, Justice Alito, you were going to ask a question about how often the situation arises. And I think it's important to point out that there is no case that Costco has pointed to, and we're not aware of them, where a U.S. copyright owner has sought to challenge resale of a copy where there was an acknowledged, authorized sale in the United States. What we're — obviously, this is a significant issue to bringing set of consistent constructions. Roberts, you say there's no case, but under what theory of yours do they not have that right? Because if the sale is authorized in the United States, then that copy would be considered lawfully made because it includes the license. That copy carries with it a license to be distributed in the United States, which would include, then, the right for a lawful owner to resell it. Again, that's consistent with the language of made, and it gives proper effect both to section 602A1, which is clearly intended to allow the owner of the U.S. distribution right to exclude legitimate copies that were made overseas, and it also sensibly construes section 109A to give effect to the exhaustion principle that underlies it, which is where a U.S. copyright owner has exercised his U.S. distribution rights with regard to a particular copy. Ginsburg. Mr. Panner, can you answer Mr. Englert's point that what earthly sense would it make to prefer goods that are manufactured abroad over those that are manufactured in the United States? Your Honor, it doesn't create any sort of a preference. As Mr. Englert suggests, that this is somehow a perf perfers the copies that are made to actually promote the sale of U.S.-manufactured goods, because foreign-manufactured goods may, therefore, be of suspect legitimacy for purposes of resale in the United States. But the key point is that in Quality King, this Court looked at the language of section 109A, and it said — and it emphasized that to determine the scope of the first-sale doctrine, that text is what matters, and it said section 109A applies to goods that are lawfully made under this title. There was no dispute that goods that are reproduced in the United States are lawfully made under this title, because one must have a U.S. — the U.S. right in order to lawfully make a copy in the United States. Breyer, there's a whole brief file that traces the history of that language and I think it comes to a somewhat different conclusion. Do you want to say anything about that? It was on the other side. Well, I think that the — the tracing of the language is helpful, actually, to understand how section — the current section 60 — excuse me, current section 109A differs from section 27, which is in section 27, what happened was is that Congress codified in 1909 the idea that the material object is different from the copyright. And when it did that, it added that language as a tag-on to that principle to ensure that it did not end up overruling legislatively Bobbs-Merrill. And when the Congress recodified the provision in 1976, it actually took section 202, put it separately, and it codified 109A in a way that is significantly different in that it says, notwithstanding the rights under 106.3, the owner of a copy lawfully made under this title is entitled to resell it. And that needs to then be read in harmony with section 602a1, which, after all, was part of the same act in 1976. It must be read in such a way as to give section 602a1 sufficient room to perform the function that it was intended to perform, which is to ensure that a U.S. copyright owner could protect domestic distribution rights against competition from legitimate foreign copies. And that's precisely what's at issue here. Alito, please. Alito How often do issues involving 602a1 come up with respect to things like books, musical recordings, movies, as opposed to the copyrighted, the material that's a place to a label, put on a label or put on goods? Thank you, Your Honor. It's a very good question. There are a number of cases that are right now coming up through the Second Circuit that involve textbooks. This has been applied to all sorts of traditional copyrighted materials, and, indeed, that's why the amici who have filed in this case are not at all limited, but include all of the traditional copyright industry software, publishing, movies, music. And, indeed, Costco does not argue that there is any legal significance to the fact that, to the nature of the image or the fact that it is placed on a watch, because I think that Costco is quite aware that what's really at stake here is whether section 602a1 will continue to provide effective protection for the exclusive distribution. Breyer, if you go to Costco, you go to Home Depot and buy a desk, and how do you know where it is? Are you worried that maybe on this desk it says there was a restriction somewhere you could only use it for homes and not for offices? Does that kind of thing worry you? No, Your Honor, it doesn't. And the reason it doesn't is because there is a first sale doctrine. And now, aren't you importing those very things that don't worry us about Home Depot into the entire world of books, everything you're talking about? You may answer, counsel. Thank you, Mr. Chief Justice. I don't think so. And the reason why is because, first of all, this doctrine has existed for nearly 30 years. It's Hornbook law that the first sale doctrine does not provide a defense in circumstances where a copyrighted article is manufactured or reproduced abroad. That has been well under the law. That was first. Do you have a second quickly? Thank you, Your Honor. And I've forgotten what it was. Thank you, Mr. Panner. Mr. Stewart. Mr. Chief Justice, and may it please the Court, the government's interpretation of section 109A is a little bit different from either of the parties, and so I want to make clear precisely what it is. In our view, the words lawfully made under this title mean made subject to and in accordance with Title 17. And because the Copyright Act doesn't apply abroad, in order for a copy to be made subject to Title 17, it would have to be created in the United States. Now, I think our interpretation of the statute still gives it a slightly different meaning from the alternative lawfully made in the United States, because at least in theory, it would be possible for the creation of a copy to entail a violation of environmental laws, workplace safety laws, minimum wage laws, et cetera, and it wouldn't be accurate to characterize a copy made in that way as lawfully made in the United States. But it would be made – it would be lawfully made under this title because it would be made subject to and in a manner consistent with the requirements of the Copyright Act. Now, with respect to the types of copyright materials at issue here, the watches are clearly very different from what Congress had in mind when it enacted Section 602A1. But in other respects, what Omega was trying to do in this case was exactly what Congress intended to allow when it expanded the importation provisions beyond restrictions on importation of radical copies. The idea was to allow a copyright owner to segment markets, to give – either retain for itself or to give to another entity exclusive rights within the United States, but give rights abroad to other producers. And it's – consequently, we argued in Quality King and we're arguing here that the Court should construe Section 109A in a way that doesn't prevent Section 602A from performing that function. And the Court in Quality King grappled with the question of whether applying the Section 109A to the labels that were at issue in that case would have the effect of negating 602A1. And the Court said no, it wouldn't, because Section 109A applies only to copies that are lawfully made under this title. And the Court specifically said it wouldn't apply to copies that were made – lawfully made under the law of a foreign country. Now, the Court didn't refer specifically to the place of manufacture. In giving the example of the British publisher who would be creating copies under the law of Great Britain, it didn't specifically say that's because British law would apply when the copies are made in England. But I think that's the necessary inference, because the Court's analysis made quite clear that it viewed a particular copy as being lawfully made under the law of one and only one place. Alito, what is your answer to the argument that if lawfully made under this title means basically made in the United States, that provides a great incentive to manufacture goods abroad, and that can't possibly be what Congress intended? Well, I think there are – I think we would say a couple of things. The question has been raised whether this gives favored status to foreign manufactured goods. And in one sense, our reading – from the perspective of the copyright owner, it's true that this creates something of a potential incentive to manufacture abroad. Now, from the perspective of the potential importer, you could say this makes foreign manufactured goods disfavored because they are harder to get in the country than would be the case if they had been manufactured within the United States and had then been sent abroad and reimported. I guess the best we can say about the treatment from the copyright owner's perspective, the differential treatment of foreign and domestic manufactured goods, is that at least with respect to goods that were made within the United States, the copyright owner has exercised rights under United States law. It has exercised its exclusive right to produce the copies in the first instance, whereas the manufacturer in Omega's position by creating and then selling the watches abroad never exercised any of its Title 17 rights. And the theory underlying the first sale doctrine, tracing it back to Bobbs-Merrill, the first articulation by this Court of the doctrine in the copyright context, the theory is that a copyright owner who sells the goods, places them in the stream of commerce, has exercised, as the Court put it in Bobbs-Merrill, its exclusive right to vend, and therefore it can claim no more rights under the copyright laws. Omega, with respect to the watches at issue here, never exercised any of its rights under Title 17, not when the watches were made and not when they were sold. I do also want to address the question of what happens in the circumstance where Omega manufactures watches abroad, but then voluntarily imports them into the United States, sells them here, cannot place restrictions on resale, because I think it's an important policy question, and here again, we get to the same point in the end as the Respondents do, but we have a somewhat different textual route to get there. Our view is that in that circumstance, Section 109A still would not apply, because even though the goods were imported into the United States, they were made abroad, and that's what counts for determining whether they were lawfully made under this title. But Section 109A is simply a safe harbor. It doesn't prohibit anything. Section 109A says if your conduct falls within these contours, then what you're doing is legal whether or not it would otherwise violate the Copyright Act. But if there's a dispute as to whether Section 109A applies and a court holds that it doesn't, the consequence is not necessarily that the conduct is unlawful. The consequence is that you look to other provisions of Title 17 to determine whether it's lawful or not. Kennedy, in your example, if there's a lawful importation of the foreign-made goods, then if you interpret made as causing to exist or appear under these laws, as the library brief suggests, the first sale doctrine would operate. I think we would say the first sale doctrine as articulated in Bobbs-Merrill would operate, but we wouldn't place this within Section 109A. Well, that's the problem I have with your position. You're suddenly saying a copyright — these issues have to be resolved not within the confines of the Copyright Act, but then you have to look to common law as well, which is a very confused situation. I think we would still be looking to other provisions of the Copyright Act rather than to common law. That is, in the hypothetical I described, clearly there could be no violation of 602A1 because the copies would have been imported by Omega itself. And so the question is, if Omega sells them within the United States and the buyer attempts to resell them, would that be an infringement of any of Omega's Title 17 rights? And the only claim that Omega could — I mean, that Omega could plausibly make in that circumstance would be to say that is a violation of my exclusive right to distribute copies to the public protected by Section 106.3. And I think the response would be, under Bobbs-Merrill, the Court already held that once the copyright owner exercised its exclusive right to vend, the word which appeared in the statute at the time, once it had exercised its exclusive right to vend the copies, it was done with them and had no more rights to assert. And there's no reason to give the right to vend, the right to distribute under the current law, a broader reading than the right to vend had at that time simply because Congress has enacted Section 109. And so I think that the — it would still be the case that in order to prevail in a copyright suit, Omega would have to show not only that Section 109 was inapplicable, but that there was a violation of the exclusive rights. And I don't think it would be able to do that here. Now, in Bobbs-Merrill, the Court was certainly drawing on common law principles, but it said in the end, its words, this is exclusively a question of statutory interpretation. It based its holding on the language of the Copyright Act as it existed at that time, specifically the exclusive right to vend, and the exclusive right to distribute copies to the public is no different for these purposes under the current statute. Breyer. I found the brief I was looking for, which is the American Intellectual Property Law Association, and they trace this back to Professor Nimmer's 1965 letter, and they said that the point there was that they were reading Bobbs-Merrill as it was a preemption question, that they thought that the copyright law was not preempting State law of contract, and State law of contract had the exception in it which applied the first sale doctrine. Now, if that's the reasoning, that reasoning would seem to me to apply. We could look up what the State law is, but my guess is that the first sale doctrine applies just as much to goods that come from abroad as to goods that are here at home. I think with respect to the preemption question, what they had in mind was a situation in which Omega sells the watch to a reseller, to a retailer on condition, for instance, that the retailer only sell them in a particular way or do particular types of advertising and the reseller sells them in violation. Breyer, as Nimmer said, as he said, we want to be sure in this bill back in 64, 65, not to invalidate any State law contractual restrictions on the right of the owner of the particular copy to dispose, exhibit, et cetera, the same. Exactly. I think the language was chosen in part, at least, to make clear that although Omega in that hypothetical circumstance would have no remedy under the Copyright Act, it might potentially have a breach of contract suit against the retailer if the retailer had breached the agreement with Omega, and that nothing in the Federal law was intended to preempt the State law contractual remedies that would otherwise be available. And I think the language adequately accomplishes that. Sotomayor, I'm sorry. Sotomayor, why don't we let contract law control the violations of any agreements with foreigners? With respect to manufacturing or distribution? I think in 1960, may I answer? Very briefly. Because many of the people with which Congress were concerned would not be in privity of contract with the U.S. copyright owner. Thank you, counsel. Mr. Englert, you have 9 minutes remaining. Thank you, Your Honor. Justice Ginsburg asked Mr. Panner what policy Congress could have had in mind to give this different status to foreign-made goods than to U.S.-made goods. And Mr. Panner's answer, and Mr. Stewart said something similar, was that in one respect Congress is disfavoring foreign goods under their interpretation by making them harder to import. That's not true. Under both of their theories, as long as the manufacturer chooses to authorize importation, which is Omega's test, or as long as authorized first sale takes place in the United States, then the first sale doctrine does apply. So the copyright holder has control under their theory, and it's not harder to import the goods. In the briefs in this case, you will not find anyone making any policy argument as to what Congress could have had in mind to favor foreign-manufactured goods. The heart of Mr. Panner's argument was that Costco's position either eliminates any significant role for section 602A1 or makes section 602A1 turn on formalities of transfer of title. Neither of those propositions is true. This Court in Quality King addressed the role that section 602A1 has to play if section 109 is applicable to imported goods, and the answer was it still applies to non-owners. That was the Court's first answer. The dictum that has been much discussed this morning was another answer, but the Court's first answer was it still applies to non-owners, and because, for example, software is licensed, there's a very live issue about whether the first sale doctrine applies to lawfully acquired copies of software. So 602A1 has a role to play under anyone's interpretation. Now, Mr. Panner asserts that our answers to some of the questions that the Court has asked, our efforts to harmonize our position with the dictum in Quality King,  Our position can perhaps be criticized and has been criticized this morning for not having a sufficient textual basis, but it cannot be criticized for making anything turn on formalities. Our position turns on the economic realities of the situation. If the copyright owner gets its one reward, the first sale doctrine applies. If the copyright owner doesn't get its one reward because, for example, it has given the exclusive foreign manufacturing rights to someone else and retained or assigned or licensed the exclusive U.S. manufacturing rights, then 602A1 has a role to play. So neither of Mr. Panner's criticisms of our position is correct. Mr. Panner asserted that section 109A differs from section 27, the predecessor statute in the 1947 Act, which in turn was section 41 of the 1909 Act. This Court said the exact opposite in Quality King. It said there is no evidence of any attempt to narrow the first sale doctrine through the language of section 109A. And if one looks at the House report, again, getting into legislative history, which some members of the Court do not like to get into, but if one looks at the House report, the first sentence of the relevant part of the House report is section 109A restates and confirms the principle that where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental or other means. No hint at using lawfully made under this title to narrow the doctrine. The last sentence of the relevant part of the House report, to come within the scope of section 109A, a copy or phonorecord must have been lawfully made under this title, though not necessarily with the copyright owner's authorization. For example, any resale of an illegally pirated phonorecord would be an infringement, but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not. So what does the House report on section 109 tell us? It tells us that lawfully made under this title was intended to expand the category of covered works beyond just those made by the copyright owner or with the authorization of the copyright owner. But under OMEGA's and the government's position, that phrase is used to contract the scope of the first sale doctrine in derogation of the common law, imposing a restraint on alienation for foreign-made goods that is not imposed on U.S.-made goods. With respect to the policy incentives that creates, it's undeniable that it creates an incentive for outsourcing of manufacture. The government admitted that in its cert stage brief and again in its brief in this Court. Obviously, if Congress wants to create an incentive for outsourcing, that's probably within its power as long as it can be said somehow to advance science and the useful arts. But there's simply not a shred of evidence in text or in legislative history that Congress intended to encourage outsourcing. Quite the contrary, the very controversial section 601, the adjacent section of section 602, required that non-dramatic literary works in the English language be manufactured in the United States or Canada, or else they would not be eligible for U.S. copyright. So we know that the 1976 Congress wanted to favor the domestic printing industry, not to disfavor it, and yet their interpretation of 602 and 109 would disfavor domestic printing industry and any domestic manufacturing industry. Thank you. Roberts. Thank you, counsel. The case is submitted.